**SO ORDERED.**

**SIGNED this 19 day of January, 2011.**



_____
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

Opinion designated for publication
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **JOHN WILLIAM KARR,** | **CASE NO. 09-20008** |
| | **CHAPTER 7** |
| **DEBTOR.** | |
| **CHRISTOPHER J. REDMOND,** | |
| **Trustee in Bankruptcy for Alexico Corporation,** | |
| **PLAINTIFF,** | |
| v. | **ADV. NO. 09-6055** |
| **JOHN WILLIAM KARR,** | |
| **DEFENDANT.** | |

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART THE**
**TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

This adversary proceeding is brought by Christopher J. Redmond, in his capacity as the Trustee of the bankruptcy estate of Alexico Corporation (hereafter "Trustee"), against Debtor John William Karr (hereafter "Karr" or "Debtor"), the sole director, shareholder, and officer of Alexico Corporation (hereafter "Alexico"). The Trustee objects to Karr's discharge under two subsections of 11 U.S.C. § 727 and, in the alternative, to the dischargeability of Karr's debts to Alexico under two subsections of 11 U.S.C. § 523.[1]

The Trustee has moved for summary judgment as to discharge under § 727(a)(7)[2] (which incorporates § 727(a)(2)(A)) and § 727(a)(5), and as to dischargeability under § 523(a)(4) and § 523(a)(6).[3] The Debtor opposed the motion, and also filed a motion to strike more than half of the Trustee's statements of uncontroverted facts for alleged non-compliance with Local Bankruptcy Rule 7056.1. By separate order, the Court has denied the motion to strike. The Trustee filed a reply brief. The Debtor, without seeking the Court's approval, then filed a sur-reply brief, which the Trustee moved to strike. By separate order, the Court has sustained the motion to strike. The Court will disregard the

---

[1] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J). There is no objection to venue or jurisdiction over the parties.

[2] 11 U.S.C. § 727(a)(7). Future references to title 11 in the text shall be to the section only.

[3] The Trustee also asserts state law claims to avoid fraudulent transfers and for damages for breach of fiduciary duty, but those claims are not involved in his summary judgment motion.

2

Debtor's sur-reply brief.

**FINDINGS OF UNCONTROVERTED FACTS.**

###### A.  THE TRUSTEE'S MOTION IS BASED UPON THE FOLLOWING UNCONTROVERTED FACTS.

From December 2, 2004, when a suit by a former stockholder of Alexico against Karr and Alexico was settled, Karr was the sole director, shareholder and officer of Alexico.  Karr was the ultimate decision maker.  On January 5, 2009, Karr filed a voluntary petition for relief under Chapter 7.  On February 16, 2009, Alexico filed a voluntary petition under Chapter 7.  Plaintiff Christopher J. Redmond was appointed trustee in the Alexico case.

Alexico's primary business was the sale of certain automotive-related insurance, warranties, and service contract products to automobile purchasers, through auto dealerships.  As an administrative office for after-market warranties, Alexico issued various policies, including an anti-theft policy known as Theft-Gard and Premium Care; a paint, fabric, and vinyl protection package known as Signature Finish; GAP coverage, which was Guaranteed Auto Protection; Travel-Gard, which was Tire and Wheel Protection; and Lease Edge and Executive Edge.

On October 8, 2003, Robert B. Sparks ("Sparks"), a former minority shareholder of the predecessor of Alexico, brought suit in Johnson County District Court against Alexico and Karr.  Sparks's petition sought damages and equitable relief for breach of fiduciary duty, fraud, breach of contract, an accounting, unpaid dividends, conversion,

3

promissory estoppel, and breach of the implied covenant of good faith and fair dealing, and sought to impose liability on Karr personally through an alter-ego or pierce-the-corporate-veil theory. The petition alleged that "Karr used Alexico as his personal piggy bank, drawing large sums of money from the company for personal expenditures and causing the company to purchase items and services intended only to benefit Karr and/or members of his family." Count II of Sparks's petition asserted a claim of fraud against Karr personally and alleged that in Alexico financial statements Karr presented to Sparks, he: (a) omitted the use of Alexico's assets to pay personal expenses of Karr; (b) omitted the extension of interest-free personal loans or advances by Alexico to Karr from corporate assets; (c) characterized and paid non-reimbursable personal expenses of Karr as reimbursable business expenses; (d) acquired assets through Alexico for the principal or sole purpose of benefitting Karr and his family personally, including but not limited to motor vehicles and an airplane; and (e) engaged in self-dealing in the assets and income of Alexico. Count II did not allege a claim against Alexico. On December 3, 2004, the District Court of Johnson County, Kansas, entered a final judgment in favor of Sparks on Count II of Sparks's petition, in the amount of $2,400,000.

Pursuant to an agreement between the parties, the Sparks judgment was kept under seal and was subject to the terms of a Mutual Release and Settlement Agreement ("Settlement") dated December 2, 2004. Among other things, the Settlement provided that the judgment in the amount of $2,400,000 would be entered "against both John W. Karr and Alexico Corporation . . . on Count II . . . [and] Sparks will voluntarily dismiss

4

with prejudice the other claims in his First Amended Complaint." The agreement further provided the Judgment could be satisfied by Karr, defined to mean John W. Karr and Alexico Corporation, paying Sparks $1,650,000 in the form of a lump sum payment of $950,000 on December 15, 2004, plus 48 monthly installments of $19,791.67 on the fifteenth day of each month thereafter. If there was a material default and failure to cure, Sparks would be entitled to immediately execute on the entire judgment amount of $2,400,000. However, if all the payments required in the Settlement were made, the judgment would be deemed fully satisfied. Karr testified that he agreed to have a judgment against him for fraud to eliminate Sparks's concern that Karr could file bankruptcy after the settlement and thereby eliminate the debt. Karr's Statement of Financial Affairs states that nothing is still owing to Sparks.

Possibly as early as 2006, Alexico experienced apparent cash flow problems.[4] Beginning in 2005 and continuing into 2006, there were instances when checks prepared by Alexico's in-house accountant on a weekly basis needed to be held rather than sent immediately because there was not sufficient money in the Alexico operating account. Alexico's in-house balance sheets for June 30, 2005, September 30, 2005, and December

---

[4] The Court rejects Karr's objection to this statement of fact and others about Alexico's financial condition, which are supported by the testimony of Alexico's in-house accountant, on the basis that the "financial condition of Alexico is opinion testimony for which an expert witness is required." Doc. 53. Fed. Rule of Evid. 701 permits a witness who is not testifying as an expert to express opinions and inferences which are "(1) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." The Court finds that to the extent an opinion about Alexico's financial condition is involved, such statements are admissible.

5

31, 2005, show negative cash balances in the operating account. This condition was also present in 2006 and 2007; for example, the negative balance in the operating account as of February 28, 2007, was $228,827.75. Alexico's 2005 tax return showed a negative equity position of $1,201,006, which increased to a negative $2,529,245 by year end 2006 and a negative $2,629,704 by year end 2007. Alexico's audited financial statement as of December 31, 2006, prepared by outside accountants, identified the total stockholder's deficit to be $5,199,274.[5] The notes to the audited financial statement include the following:

> As of the report date the Company continues its business operations despite difficulties with cash flow and a general downward movement in the automotive market. . . . The viability of continuing business operations is contingent upon the Company's ability to mange its relationships with reinsurers and agents under payment terms that will allow the Company to extend obligations until such time as cash flow allows repayment.

Karr admits that Alexico had cash flow problems and that he became aware of a serious cash flow problem by the summer of 2007. When insufficient cash was available to pay all creditors, Karr directed the in-house accountant which creditors to pay and when.

One of the reinsurers of Alexico's warranty products, Allstate, performed an

---

[5] The Court rejects Karr's objections to the Trustee's statements of fact based upon the audited financial statement as inadmissible opinion testimony for the reasons stated in note 4 above. The Court also rejects the objection that it is inadmissible hearsay. The Court finds the financial statement admissible under the business records exception of Fed. R. Evid. 803(6). As stated in the Trustee's affidavit, the audited financial statement was included in Alexico's business records. Contrary to Karr's position, the fact that the statement was not created internally does not place it outside the business records exception to the hearsay rule. *See Fernandez v. Chios Shipping Co., Ltd.*, 542 F. 2d 145, 154 n.16 (2nd Cir. 1976); *In re Vaniman Int'l, Inc.*, 22 B.R. 166, 192 (Bankr. E.D.N.Y. 1982).

6

internal audit of Alexico in September 2007. The report described Alexico's financial condition as "seriously impaired" and questioned whether Alexico could "continue as a going concern." The report stated that Alexico was delinquent on two invoices to Allstate amounting to over $600,000, and new invoices were about to be billed.[6] In March 2008, Allstate required that commissions paid to Alexico for the sale of products that Allstate insured be sent to a lockbox. This had a big adverse effect on Alexico's cash flow problems. At this time, another large reinsurer creditor was communicating with Karr about substantial outstanding obligations owed to it by Alexico. During 2008, Alexico's accountant would have to hold back automatically-generated checks for so long that, by the time cash was available, the dates on the checks became an issue, and new checks were created before payment was sent.

Karr admits that he did not distinguish between himself and Alexico.[7] From 2001 forward, Alexico's accountant paid Karr's personal expenses and the expenses of some of Karr's family members. Initially, the accountant had signatory authority for Karr's personal account at First National Bank, to which his salary was deposited and from

_____

[6] Karr objects to the Trustee's reliance on the Allstate audit as inadmissible hearsay and as opinion evidence for which an expert is required. The Court rejects the objection based upon the hearsay rule because the Allstate audit report is within the business records exception of Fed. R. Evid. 803(6). *See* note 5 above. As stated in the Trustee's affidavit, the Allstate audit was included in Alexico's financial records when it filed for bankruptcy relief. Further, Karr testified that Allstate, because it was one of Alexico's insurers, could at any time do an audit. Karr also testified about the portions of the audit that are included in the Trustee's statement of facts and did not assert they were erroneous. Pl. Ex 13, 109:3-113:17. In addition, Karr relies upon the Allstate audit in the additional statements of fact he presented to the Court. Doc. 53. The Court also rejects the objection based upon opinion evidence for the reasons stated in note 4 above.

[7] Doc. 53, p. 26.

7

which his bills were paid.  An Advance to Officer Account was established in Alexico's

books to show advances made to Karr in excess of his salary when Karr directed the

cutting of a check for deposit to his personal account because its balance was not

sufficient to cover his expenses.  After Karr's personal checking account was garnished

by the State of Kansas prior to December 2005, Karr directed the accountant to make his

salary deposits as credits to the Advance to Officer Account and to pay his expenses

through the Alexico bank account, with appropriate debits to the Advance to Officer

Account.  At Karr's direction, Alexico also made some deposits to the bank accounts and

savings accounts of some of Karr's family members.  The deposits were considered to be

advances to Karr and were recorded in the Advance to Officer Account.  For the period

from July 2007 to June 2008, disbursements from the Advance to Officer Account

exceeded credits for salary and capital distributions by an amount in excess of $450,000.[8]

Karr was married at least three times to three different women, Sherry, Dawn, and

Crystal Karr, and divorced from each of them.  Maintenance payments to Sherry Karr of

$7,500 per month were paid by Alexico through 2008.  Maintenance payments to Crystal

Karr of $5,000 per month for 20 months commenced April 1, 2008, and some payments

were made.  Karr has two children, Austin and Alexis.  In 2008, Karr continued to have

Alexico make payments for his daughter's BMW, auto insurance, and cable service, and

---

[8] The Court's own review of the statements for the Advance to Officer Account, submitted by the
Trustee as Exhibit 17 in support of his motion for summary judgment, shows payments to Karr in excess
of his salary each month from March 2008 through June 2008 as follows:  March $25,640.69; April
$44,601.55; May $37,122.21; and June $28,299.58.

deposits to her savings account. In 2008, Karr also continued to have Alexico make payments on his own country club membership and for maintenance of his swimming pool.

Over the years of Alexico's operation, Alexico acquired vehicles for Karr's personal use, including a Ferrari F430, a Ferrari Stradali, a Mercedes CLK63, an Aston Martin, and a Porsche, among others. Karr continued the purchase of luxury automobiles through August 2007. In 2008, Karr conveyed a corporate automobile to his latest ex-wife in their divorce settlement. The Mercedes SUV was worth $103,738.76 as shown on Alexico's July 2008 balance sheet, but was "awarded" to Karr's ex-wife sometime between that date and the September 30, 2008, balance sheet.

Karr received salary compensation from Alexico that was in excess of $1 million each year from 2005 through 2007. He continued to take a salary until February 2008. Karr received capital distributions from Alexico in the amounts of $2,700,000 in 2005 and $1,500,000 in 2006.[9]

The Allstate internal audit report from September 2007 included the following as a Critical Audit Finding: "Alexico also pays the owner['s] personal expenses. It was determined that insurance company funds are utilized to pay approximately $150,000 each month of the owner['s] personal expenses. The company only generates

---

[9] Karr attempts to controvert this statement, which is support by copies of Alexico's federal income tax returns, by stating that the contributions were credited to his Advance to Officer Account. The Court finds this fact, assuming it is true, does not controvert the Trustee's statement, as there was a distribution whether it was in cash or a credit to his account.

9

approximately $50,000 in operating profit from the business.  Consequently, the advances paid to the stockholder approximate $76,000 per month plus a $20,000 per month legal settlement with an ex-employee causing the negative cash flow situation."[10]

Starting in the fall of 2007, a portion of the premiums due to Old United, a reinsurer, were held back and those funds were used to pay other expenses, including Karr's divorce payments, the Sparks Settlement, and the IRS.  Alexico continued to sell Travel-Gard warranties until it filed for bankruptcy on October 31, 2008.  At that time, it was holding back checks for payments of Travel-Gard claims because it had insufficient cash.

Karr provided a personal financial statement to an individual and corporate creditor, Great Western Bank, as of July 12, 2007.  The financial statement reported that Alexico was worth $5,000,000, and that Karr had personal property valued at $500,000 and artwork valued at $70,000.

## B.  DEFENDANT KARR'S STATEMENT OF FACTS SUBMITTED IN RESPONSE TO THE TRUSTEE'S MOTION.

Karr, when opposing the Trustee's motion, sets forth 30 paragraphs of statements of fact.  The majority of these statements are nearly identical to those submitted in attempting to controvert the facts submitted by the Trustee in support of his motion for summary judgment.  The Trustee controverts all but a few of Karr's statements.

---

[10] Karr attempts to controvert this statement on the basis that it is inadmissible hearsay and opinion testimony for which an expert is required.  The Court rejects these arguments for the reasons stated in notes 4 and 5 above.  Although Karr did not testify about this portion of the report in his deposition, he provides no evidence that the quoted statement is not accurate.

Karr begins his statement of uncontroverted facts with several statements about the December 2, 2004, settlement of the Sparks litigation, which the Court finds are not proper for inclusion in the statement of facts portion of a memorandum in opposition to a motion for summary judgment because they are in essence legal conclusions. The uncontroverted facts about the settlement are stated above. Karr's statement of facts includes the following: "Alexico and Karr were both responsible for making payments under the Settlement Agreement. . . . Because Alexico was liable under the Settlement Agreement, Sparks could have enforced the Settlement Agreement against Alexico if there was a default under the Settlement Agreement. . . . The lawsuit with Robert Sparks was a shareholder lawsuit." The Trustee controverts these statements, asserting that the Settlement Agreement and the payments are examples of Karr's use of corporate assets to satisfy his personal obligations, since the corporation was not a defendant in Count II, the count allegedly settled with Sparks. The Trustee also asserts that the complaint, although brought by a shareholder, involved more than a "shareholder suit." As to the additional "facts" provided by Karr, the Court finds that they evidence a legal dispute as to the legal impact of the Settlement, not additional uncontroverted facts.

Karr states as uncontroverted that he "does not recall when Alexico began experiencing cash flow issues; however, he believes that he first became aware of Alexico's cash flow issues in late 2007." This statement is controverted. As previously found, it is uncontroverted that Karr became aware of Alexico's cash flow problems by the summer of 2007. Karr further states that when he "became aware of Alexico's cash

11

flow issues, he reduced his monthly salary from $80,000 to $33,000," and that he did not

take a salary in May 2008. This statement is controverted. The Trustee, relying on the

Advance to Officer Account transaction records, responds that Karr's salary was not

reduced until February 2008, several months after he states he became aware of the cash

flow issues, and that he took his salary as scheduled on May 15, 2008, and May 31, 2008.

Karr's statements about his attempt to sell the company are controverted. Karr

states as follows:

> After he was unable to secure the loan, Defendant Karr attempted to sell
> Alexico. In fact, Defendant Karr reached an agreement in principle with a
> company to purchase Alexico. However, the agreement fell through and
> Defendant Karr was unable to sell the business to the prospective purchaser.
> Mr. Karr believed that he could sell the business for between $8,000,000.00
> and $10,000,000.00. Based upon this evaluation, Defendant Karr remained
> confident that he could sell Alexico and pay off its liabilities, including the
> Advance to Officer Account.[11]

The Trustee asserts that these statements are controverted because they are supported only

by self-serving, conclusory statements provided by Karr's affidavit, without any

supporting details. The Trustee specifically controverts Karr's statement of the value of

the business. As to the value of the business, Karr cites the Allstate audit, which in a box

on the right margin of the document labeled "deleted" states: "The company is in dire

need of a potential equity partner to secure additional funding, since it is estimated that

the market value of Alexico's business is anywhere from $8 million to $10 million." As

the Trustee points out, in the body of the audit, as opposed to the box labeled "deleted,"

---

[11] Doc. 53, p. 28, ¶¶ 10-14 (citations to record omitted).

the report states: "Currently, Alexico's financial condition is seriously impaired and there is a question as to whether [it] can continue as a going concern." The body of the report also states: "The most significant asset on Alexico's books is a $2.6 million Advance to Stockholder. It is not known if the owner of this Subchapter S-Corporation has any other assets to contribute as a capital infusion. The company requires an infusion of cash and is presently in a negative equity position of $2.8 million as per [its] June 30, 2007 balance sheet." The Court finds, as urged by the Trustee, that the Allstate audit does not provide a basis for a reasonable belief that Alexico could be sold for $8,000,000 to $10,000,000.

As to Karr's July 2002 financial statement presented to Great Western Bank, Karr submits the following as uncontroverted facts. "The $500,000 figure listed on the July, 2007 financial statement he provided to Great West[ern] Bank was an estimation of the value of [his] personal property." The Trustee does not controvert this statement. Karr further states: "In the above referenced financial statement, Defendant Karr did not list any specific items of personal property." The Trustee responds, correctly, that the financial statement identified several items of personal property, including two automobiles, a 401k balance of $125,000, and artwork valued at $70,000. Karr further states: (1) "Any items of artwork listed on the financial statement were included in his bankruptcy schedules," (2) "Defendant Karr still has the artwork which he valued at $70,000.00 on the Great West[ern] Bank statement, except for two pieces which were sold," and (3) "The value of the artwork is currently significantly less than $70,000.00." As the Trustee points out, the foregoing are supported only by Karr's affidavit, with no

13

specifics concerning valuations or past sales.

Karr's statement of uncontroverted facts includes the following regarding the

Advance to Officer Account:

> When Alexico did not have sufficient cash flow to pay all its
> creditors, Alexico had to decide which creditors to pay.  Defendant Karr,
> rather than Alexico[,] paid his personal expenses.  Defendant Karr[]
> directed Ms. Heermann to pay his personal expenses out of his Advance to
> Officer Account.  Any salary owed Defendant Karr was credited to his
> [A]dvance to [O]fficer [A]ccount, and any personal expenses paid out of
> Defendant Karr's Advance to Officer Account in excess of his salary would
> remain in the Advance to Officer Account.  Any dividend distributions
> listed on Alexico's Federal Income Tax Returns were not paid to Defendant
> Karr.  Rather, they were used to pay down [his] Advance to Officer
> Account.  Moreover, every single penny that entered into and exited the
> Advance to Officer Account was accounted for and its whereabouts
> explained.[12]

These statements, when viewed simply as facts about Alexico's accounting procedures

relating to the payment of Karr's personal expenses by the corporation, are the same as

the uncontroverted facts found in the preceding section.  As stated by Karr and not

disputed by the Trustee, the Advance to Officer Account properly identifies and

documents the transactions that flowed through the account.  To the extent Karr's

statements of fact vary from the uncontroverted facts found above, they are arguments as

to the legal implications of the procedures and are not proper for inclusion in statements

of fact submitted in response to a motion for summary judgment.

Karr's statement of uncontroverted facts includes several statements of his belief

---

[12] Doc. 53, p. 29-30, ¶¶ 25, 27, 28, 23, & 31 (citations to record omitted).

and intent.  Karr states:

> All actions in deciding which creditors to pay were made with the intent of continuing the business of Alexico with the ultimate goal of selling Alexico.  I never took an action that I believed would harm Alexico or its value.  Because I was the sole shareholder of Alexico, any harm to Alexico would have diminished the value of my stock in Alexico and directly harmed me.[13]

The Trustee responds that these statements, which are supported only by Karr's affidavit, are contrary to the manner in which Karr operated Alexico, which in the Trustee's view harmed Alexico to the benefit of Karr personally.  Whether they are sufficient to create a material fact in controversy will be discussed in the analysis section of this opinion.

**ANALYSIS AND CONCLUSIONS OF LAW.**

### A.  SUMMARY JUDGMENT AND BURDEN OF PROOF.

Rule 56 of the Federal Rules of Civil Procedure applies in adversary proceedings.  Pursuant to that rule, a judgment sought by a properly filed and supported motion for summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The provisions for denial of discharge of all debts under § 727 are "generally construed in favor of the debtor and strictly against the creditor."[14]  The same rule applies to determining whether a

---

[13] Doc. 53, p. 29-30, ¶¶ 26, 29, & 30 (citations to record omitted).

[14] 6 *Collier on Bankruptcy* ¶ 727. 01 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2010).

particular debt falls within one of the exceptions to discharge of § 523.[15]  As to both

objections to the discharge of all debts and the excepting of specific debts from discharge,

the objecting party has the burden of proving the objection[16] by a preponderance of the

evidence.[17]

## B.  DENIAL OF DISCHARGE UNDER § 727(a)(7) AND § 727(a)(2)(A).

"Section 727(a)(7) extends the basis for denial of discharge [from misconduct in

the debtor's own case] to the debtor's misconduct in a substantially contemporaneous

related bankruptcy case."[18]  It provides:

> (a) The court shall grant a debtor a discharge, unless —
> . . .
> (7) the debtor has committed any act specified in
> paragraph (2), (3), (4), (5), or (6) of this subsection, on
> or within one year before the date of the filing of the
> petition, or during the case, in connection with another
> case, under this title or under the Bankruptcy Act,
> concerning an insider.

A commentator explains the operation of the exception as follows, "Thus, if the debtor

engages in objectionable conduct in a case involving . . . a corporation of which the

debtor is an officer, director or controlling person, the debtor may be denied a discharge

---

[15] *Id.* at ¶ 523.05.

[16] Fed. R. Bankr. P. 4005.

[17] *In re Serafini*, 938 F.2d 1156 (10th Cir. 1991) (proceedings objecting to discharge of all debts under § 727); *Grogan v. Garner*, 498 U.S. 279 (1991) (proceedings to except specific debts from discharge under § 523).

[18] 6 *Collier on Bankruptcy* ¶ 727.10.

16

in the debtor's own case."[19]

Two requirements must be satisfied. The debtor must be an insider of the debtor in another case, and the debtor must have engaged in an act proscribed by § 727(a)(2), (3), (4), (5), or (6). For purposes of § 727(a)(7) , "insider" is defined by § 101(31). Since Karr was the president, sole director, and sole stockholder of Alexico and controlled its business, this element is satisfied. To satisfy the second requirement for denial of discharge under § 727(a)(7), the Trustee alleges that Karr's conduct was objectionable under § 727(a)(2)(A), which provides:

> (a) The court shall grant the debtor a discharge, unless —
> . . .
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed —
>
> > (A) property of the debtor, within one year before the date of the filing of the petition.

In this case, it is uncontroverted that Karr was an insider of Alexico. Thus, if, within one year before the date of the filing of the Alexico petition, Karr transferred property of Alexico in violation of § 727(a)(2)(A), Karr may be denied a discharge in his own Chapter 7 case. The elements of a § 727(a)(2)(A) claim are: (1) The debtor or his duly authorized agent transferred, removed, destroyed, mutilated, or concealed

---

[19] *Id.*

17

(2) property of the debtor, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.[20] To deny a discharge under this subsection, the court must find "'*actual* intent to defraud creditors.'"[21] "Fraudulent intent of course may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[22] "The initial burden is upon the objecting creditor to establish reasonable grounds for believing the bankrupt has committed acts which will prevent his discharge. . . . [T]he bankrupt must then assume the burden of showing that the transfer was justified under all the circumstances."[23]

Since Karr was an insider of Alexico, the elements required for denial of Karr's discharge under § 727(a)(7) are: (1) that Karr transferred substantial assets of Alexico to himself or to others for his benefit; (2) that such transfers occurred at Karr's direction; (3) that such transfers occurred within one year of Alexico's bankruptcy filing on February 16, 2009, and (4) that such transfers were made with intent to hinder, delay, or defraud creditors of Alexico.

Here, the uncontroverted facts clearly establish that within one year prior to Alexico's filing, under Karr's direction, substantial funds from Alexico's operating account in excess of Karr's salary were transferred for Karr's benefit. During this time

---

[20] *Mathai v. Warren ( In re Warren)*, 512 F3d 1241, 1249 (10th Cir. 2008).

[21] *Id.* (quoting *Marine Midland Bus. Loans, Inc., v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991)).

[22] *Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

[23] *McMullin v. Todd*, 228 F.2d 139, 142 (10th Cir. 1955).

18

period, as previously found, Karr admits that he did not distinguish between himself and Alexico, and all of his personal expenses were paid from Alexico's operating account, with appropriate entries to Alexico's Advance to Officer Account. The charges to the Advance to Officer Account exceeded the credits by more than $450,000 from July 2007 to June 2008. Karr's personal obligations paid by the corporation during 2008 included maintenance payments to two ex-wives, his country club membership and pool maintenance expenses, payments for Karr's daughter's BMW, auto insurance, and cable service, and deposits to her savings account. In 2008, Karr conveyed a corporate Mercedes SUV, valued at $103,738.76, to his latest ex-wife in their divorce settlement.

The Court does not include payments on the Sparks Settlement in the transfers for Karr's benefit which satisfy the elements of § 727(a)(2)(A). The Court finds that there are controverted issues of fact concerning Alexico's liability under the Settlement. It is true that Alexico was not a defendant in Count II of the Sparks complaint under which the Settlement states liability was agreed to, but Alexico was a defendant in other counts which were dismissed. These additional counts may have had value which for convenience was wrapped into the settlement of Count II against Karr. Without further evidence concerning the merits of Sparks's lawsuit and the intent of the Settlement, the Court can not determine whether Alexico's alleged liability to Sparks was based upon corporate wrongdoing, or whether the inclusion of Alexico as a liable party under the Settlement is further evidence of Karr's fraudulent conduct. There are disputed issues of material fact as to whether payments on the Sparks Settlement were payments to a

19

creditor of Alexico rather than fraudulent transfers for the benefit of Karr.

The circumstantial evidence establishes that the transfers for the benefit of Karr were made with intent to hinder, delay, or defraud Alexico's creditors. From at least late 2005 forward, Alexico, at Karr's direction, paid all of Karr's personal expenses. Alexico began experiencing cash flow problems as early as 2006, yet Karr was credited with a salary in excess of $1,000,000 each year from 2005 to 2007. The practice of Alexico paying all of Karr's expenses continued after the summer of 2007, when Karr admits that he was aware of Alexico's cash flow problems. In September 2007, when Alexico was delinquent on two invoices to Allstate amounting to over $600,000, Allstate, a reinsurer of Alexico, conducted an audit of Alexico. The audit described Alexico's financial situation as "seriously impaired." It noted that the payment of Karr's personal expenses using insurance company funds was occurring, and that the excess of these expenses over the company's operating profit was causing a negative cash flow situation. After the audit, in March 2008, Allstate required that commissions paid to Alexico be forwarded to Allstate through a lockbox arrangement. This change made the cash flow situation worse. During 2008, Alexico's accountant would have to hold back automatically-generated checks for so long that by the time cash was available to pay them, the dates on the checks became an issue and new checks were created before payment was sent. Another large insurer, in addition to Allstate, began communicating with Alexico regarding a substantial outstanding obligation. However, despite all of these events indicating that Alexico had insufficient funds to pay both its creditors and Karr's personal expenses,

20

Karr did not stop the practice of having Alexico pay his personal expenses.

For the foregoing reasons, the Court concludes that the Trustee has made out a prima facie case that Karr should be denied a discharge under § 727(a)(7) because as an insider of Alexico, within the year preceding Alexico's bankruptcy, Karr, with the intent to delay payment of Alexico's creditors, directed the transfer of Alexico's assets for his own benefit and the benefit of his family, within the meaning of § 727(a)(2)(A).

Karr has not satisfied his burden to justify the transfers. Karr does not contest the fact that he was an insider or that substantial transfers from the Alexico operating account were made for his benefit when Alexico had cash flow issues and was not paying all of its creditors. His first defense is a legal one, the argument that there is no § 727(a)(2)(A) violation since the property in issue was not his own property. The Court rejects this position since it totally ignores the fact that the Trustee is proceeding under § 727(a)(7), which provides that if a debtor engages in objectionable conduct in a case concerning a corporation of which the debtor is an insider, the debtor may be denied a discharge in the debtor's own case. Under this theory, the relevant transfers are transfers of Debtor Alexico's property, not Debtor Karr's property.

Karr's second defense is also legal. Karr argues that he "was not using Alexico funds for these personal expenses,"[24] since they were charged to the Alexico Advance to Officer Account. The Court denies this defense. It is uncontroverted that the personal

---

[24] Doc. 53, p. 34.

21

expenses were paid from the Alexico operating account; there was a transfer of Alexico's property. The fact that the payments were fully accounted for by entries to Alexico's Advance to Officer Account does not change their nature.

As to Karr's third defense, the Court finds no issues of material fact exist concerning Karr's intent to hinder, delay, or defraud Alexico's creditors. The evidence of substantial payments from Alexico's assets for Karr's benefit is uncontroverted. The only evidence offered by Karr of actions, taken after he became aware of the cash flow issues in the summer of 2007, that allegedly negate an intent to hinder, delay, or defraud Alexico's creditors is that Karr reduced his salary in March 2008 and allegedly received no salary in May 2008.[25] However, Karr has admitted that he knew of the cash flow problems since at least the summer of 2007, so that response was significantly delayed. Further, assuming that his salary was reduced in response to Karr's learning of the cash flow problems, since there is no evidence that the reduction was accompanied by a termination of Alexico's practice of paying all of Karr's expenses, even in excess of his salary, the reduction of the salary had no impact on the availability of funds to pay Alexico's creditors. Karr offers no evidence that payments to creditors of Alexico were ever favored over payment of his personal expenses. Therefore, to the extent there are controverted facts about Karr's salary, those controversies are not material to the finding of a violation of § 727(a)(2)(A).

---

[25] Karr's statement that he received no salary in May 2008 is refuted by the details of the Advance to Officer Account included as Plaintiff's Exhibit 17.

As to Karr's fourth defense, the Court finds no issue of material fact arising from Karr's argument that he was obligated to and fully intended to repay the advances. Although legally Karr was obligated to repay the advances, Karr offers no evidence that he ever repaid any of the advances made by the corporation, even in part, or that he acknowledged his obligation to do so before Alexico filed for bankruptcy relief. There are no contemporaneous promissory notes or minutes of corporate meetings evidencing that the advances were considered loans. The only evidence which Karr offers to show his acknowledgement of his duty to repay the corporation are statements in his affidavit that he attempted unsuccessfully to get a loan and that even though one sale of Alexico fell through, he "fully anticipated that he could sell Alexico and pay off its existing liabilities, including the Advance to Officer Account." This defense is unsuccessful. It does not address the prima facie case that the advances were fraudulent when taken; at most it indicates after-the-fact acknowledgment of an obligation to restore the corporation for his wrongful prior acts. Any controversies concerning the alleged intent to obtain a loan and then to sell the company are not material to finding a violation of § 727(a)(2)(A).

For the foregoing reasons, the Court finds that the Trustee is entitled to summary judgment on his objection to Karr's discharge under § 727(a)(7) because of the fraudulent transfers of Alexico's property, made at Karr's direction, within one year of Alexico's petition date with intent to hinder and delay Alexico's creditors, within the meaning of § 727(a)(2)(A). Karr has failed to justify the transfers.

23

## C.  DENIAL OF DISCHARGE UNDER § 727(a)(5).

Subsection 727(a)(5) provides that a debtor shall be granted a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  "[N]oticeably lacking from § 727(a)(5) is any element of wrongful intent, or, for that matter, any affirmative defenses — § 727(a)(5) simply imposes strict liability."[26] "A party objecting to a debtor's discharge under § 727(a)(5) has the burden of proving facts establishing that a loss or shrinkage of assets actually occurred.  However, once the objecting party meets its initial burden of proof, the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner."[27]  The explanation must be more than a "vague explanation" unsupported by "documentation or some other corroboration."[28]  The explanation should be "sufficient to enable either the trustee or a creditor to properly investigate the circumstances surrounding the loss or deficiency."[29]

In this case, the Trustee asserts that Debtor should be denied a discharge under § 727(a)(5) because he has failed to satisfactorily explain the discrepancy between the report of his ownership of personal property valued at $500,000, plus artwork valued at $70,000, in his financial statement as of July 12, 2007, and the disclosure of personal

---

[26] *Baker v. Reed (In re Reed)*, 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004).

[27] *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001).

[28] *Gray v. Gray (In re Gray)*, 295 B.R. 338, 346 (Bankr. W.D. Mo. 2003).

[29] *Reed*, 310 B.R. at 370.

property totaling only $132,925.42 on his bankruptcy schedules filed on January 5, 2009, including "CD's; Art; Collectibles" valued at $500.

Karr responds that the Trustee has not made an essential element of his case since he has not identified "a specific fund or an identifiable piece of property" as the basis for his objection.[30] The Court disagrees. First, the Trustee's objection is based in part on a very specific asset, artwork, which was valued at $70,000 on the financial statement and at less than $500 on Debtor's schedules. Second, the financial statement sufficiently identifies specific assets, since it included $500,000 of personal property in addition to other assets of $25,000 in cash, $5,000,000 in securities, a $1,4000,000 homestead, $100,000 worth of other real estate, and two specific automobiles. The $500,000 value was therefore attributable to personal property other than cash, securities, artwork, and automobiles. The Court finds this description sufficiently specific.

Since the Trustee has identified specific assets which were present approximately 18 months before filing and are not included in Debtor's schedules, the burden shifts to Debtor to adequately explain the loss. This Debtor has failed to do. As to the artwork, Debtor states by affidavit that "[a]ny items of artwork listed on the financial statement were included in his bankruptcy schedules," "Defendant Karr still has the artwork which he valued at $70,000.00 on the Great West[ern] Bank statement, except for two pieces which were sold," and "[t]he value of the artwork is currently significantly less than

---

[30] Karr cites *Urological Group, Ltd., v. Petersen (In re Peterson)*, 296 B.R. 766, 792 (Bankr. C.D. Ill. 2003) in support.

$70,000.00."  He provides no other details, such as what artwork was included in the $70,000 valuation and what artwork has been sold, to whom, and for what amount.  Karr provides no details as to the artwork remaining, or any evidence other than his general statement as to its value.  Further, Karr makes no attempt whatsoever to explain the apparent loss of almost $500,000 of other personal property.  Debtor's response does not satisfy the minimum requirements to avoid denial of discharge under § 727(a)(5).

### D.  EXCEPTION TO DISCHARGEABILITY FOR DEBTOR'S DEBT TO ALEXICO UNDER § 523(a)(4).

The Trustee also moves for summary judgment under § 523(a)(4), which provides that a Chapter 7 discharge does not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity."  "Although the question of fiduciary status under this provision is one of federal law, state law is an important factor in determining when a trust relationship exists."[31]  Alexico is a Nevada corporation.  Under Nevada common law, an officer or director serves as a fiduciary to the corporation.[32]  The Nevada Supreme Court has recognized that "'A director is a fiduciary. . . . So is a dominant or controlling stockholder or group of stockholders. . . . Their powers are powers in trust.'"[33]

Commentators agree that for purposes of § 523(a)(4), the relationship of a

---

[31] *Driggs v. Black (In re Black)*, 787 F.2d 503, 506 (10th Cir. 1986), *overruled on other grounds*, *Grogan v. Garner*, 498 U.S. 279 (1991).

[32] *Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 86, 734 P.2d 1221, 1224 (1987).

[33] *Foster v. Arata*, 74 Nev. 143, 155, 325 P.2d 759, 765 (1958) (*quoting Pepper v. Litton*, 308 U.S. 295, 306 (1939)).

26

corporate officer to the corporation commonly imposes a fiduciary relationship.[34] Officers of corporations "are fiduciaries as to corporate stockholders as well as to the corporation itself with respect to funds controlled by them."[35] "Corporate officers and directors are widely viewed as acting as fiduciaries with respect to their corporation,"[36] and the "[n]ondischargeable liability of corporate officers to the corporation, or its trustee in bankruptcy, ... is well established."[37]

As stated by a former judge of this Court in 1983, "it has long been settled that a corporate officer is a 'fiduciary' of the corporation, within the meaning of § 523(a)(4) and § 17(a)(4), its predecessor section under the Bankruptcy Act of 1898."[38] Application of this rule to facts similar to this case is illustrated by *In re Decker*.[39] Debtor Decker was the president and principal manager, as well as a shareholder and director, of Black's, Inc. Despite Black's poor financial condition, Decker withdrew substantial funds from Black's for his personal use and for his purchase of Black's stock. Although the debts

---

[34] Leah A. Kahl and Peter C. Ismay, *Exceptions to Discharge for Fiduciary Fraud, Larceny, and Embezzlement*, 7 J. Bankr. L. & Prac. 119, 122 (1998).

[35] 3 *Norton Bankr. L. & Prac.* ¶ 57:27 at p. 57-79 (3d ed., Thomson Reuters 2010).

[36] Kahl and Ismay, *Exceptions to Discharge for Fiduciary Fraud, Larceny, and Embezzlement*, 7 J. Bankr. L. & Prac. at 129.

[37] 3 *Norton Bankr. L. & Prac.* ¶ 57:27 at p. 57-80 (citing *In re Hammond*, 98 F.2d 703 (2nd Cir. 1938) and *Pepper v. Litton*, 308 U.S. 295 (1939)).

[38] *American Metals Corp. v. Cowley (In re Cowley)*, 35 B.R. 526, 528-29 (Bankr. D. Kan. 1983) (Franklin, J.). Although *Cowley* was decided with reference to Kansas corporate law, it cited *Pepper v. Litton*, the United States Supreme Court case quoted by the Nevada Supreme Court in *Foster v. Arata*, 74 Nev. at 155, 325 P.2d at 765.

[39] *Black's Inc. v. Decker (In re Decker)*, 36 B.R. 452 (D.N.D. 1983).

were fully and accurately reflected upon the books, records, and accounts of Black's, which were available for inspection by interested persons, Decker did not specifically disclose the transfers to the other directors or sign promissory notes for the money. In Decker's subsequent bankruptcy, Black's objected to discharge of Decker's debt to it. The court held that Decker was a fiduciary as to the corporation and incurred the debt to the corporation through fraud or defalcation while acting in a fiduciary capacity,[40] saying he failed "to act in the best interests of Black's or with full disclosure and assent."[41]

The Court therefore concludes that Karr stood in a fiduciary relationship to Alexico. The debt of Karr to the Alexico bankruptcy estate for property of Alexico which Karr diverted for his personal use is a fiduciary debt for purposes of § 523(a)(4).

The Court rejects Karr's defense that "fiduciary" for purposes of § 523(a)(4) is so narrowly construed as to exclude Karr's relationship to Alexico. The primary case Karr relies upon is *In re Cantrell*,[42] a Ninth Circuit case where judgment creditors objected to the discharge of a debtor-corporate-officer's debt arising from misappropriation of corporate assets. The court found no fiduciary relationship for purposes of § 523(a)(4) because under California law, while corporate officers "possess the fiduciary duties of an agent, they are not trustees with respect to corporate assets."[43] Of course, this case is not

---

[40] *Id*. at 456-59.

[41] *Id*. at 459.

[42] *Cal-Micro, Inc., v. Cantrell (In re Cantrell)*, 329 F.3d 1119 (9th Cir. 2003).

[43] *Id*. at 1127.

28

controlled by California law.

The Court also rejects Karr's further argument that a § 523(a)(4) fiduciary relationship exists only when there is an express or technical trust, an argument derived from the Supreme Court's decision in *Davis*.[44]  This requirement has been applied by the Tenth Circuit to find that there was no fiduciary relationship between a corporate officer of a construction company and the owner of four-plexes with whom the corporation contracted.[45]  The Tenth Circuit has also found no fiduciary duty between a corporate officer and a minority stockholder.[46]  But this rule requiring an express or technical trust does not apply when a corporation, rather than a corporate creditor or individual shareholder, objects to the discharge of a corporate officer's debt to it.[47]  "[W]hen the [Supreme] Court interpreted the meaning of the term 'fiduciary capacity' to require a technical or express trust, . . . the Court did not mean to say that an officer of a corporation was not a fiduciary."[48]  Such an interpretation would be contrary to the settled rule that a corporate officer is a fiduciary of the corporation, within the meaning of § 523(a)(4) and its predecessor under the Bankruptcy Act of 1898.[49]

---

[44] *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934).

[45] *Allen v. Romero (In re Romero)*, 535 F.2d 618 (10th Cir. 1976).

[46] *Black*, 787 F.2d at 506.

[47] *Cowley*, 35 B.R. at 529, n.1 (stating "[a] corporate officer may not be a fiduciary of the corporation's creditors absent a statutory, technical, or express trust" and citing *Davis* and *Romero*.)

[48] *Decker*, 36 B.R. at 457-58.

[49] *See Cowley*, 35 B.R. at 528-29.

29

The second element of the Trustee's objection to the discharge of Karr's debt to Alexico is whether there was a defalcation. The Tenth Circuit BAP has held that "'defalcation' under section 523(a)(4) is a fiduciary-debtor's failure to account for funds which have been entrusted to it [sic] due to any breach of fiduciary duty, whether intentional, wil[l]ful, reckless, or negligent."[50] This standard requires no "mental culpability on the part of the debtor-fiduciary."[51] "Any failure to maintain the standard of care attributable to a fiduciary is a bad act that is nondischargeable under section 523(a)(4)."[52]

There is no question that the actions of Karr creating his liability to Alexico were defalcations. Karr converted corporate assets to his own and his family's use while corporate creditors went unpaid, thereby breaching his duty of care, loyalty and good faith to Alexico. He continued this conduct while he knew that his personal expenditures were causing a severe financial burden. The fact that the corporation kept records of the funds advanced in breach of Karr's fiduciary duty does not mean that there was no defalcation. Even assuming, as contended by Karr, that the excess payments were loans, there is no evidence of notes or an agreement as to the terms of repayment. As a fiduciary, Karr had a duty not to loan corporate assets on a less than arm's-length basis.[53]

---

[50] *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 288 (10th Cir. BAP 1997).

[51] *Id*. at 289.

[52] *Id*.

[53] *Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir. 1990).

30

The Trustee is entitled to summary judgment on his claim of exception to discharge under § 523(a)(4). The uncontroverted facts establish that Karr's debts to the Alexico estate were incurred by defalcations committed when Karr was acting as a fiduciary to Alexico.

## E. DISCHARGEABILITY OF KARR'S DEBTS TO ALEXICO PURSUANT TO § 523(a)(6).

The Trustee also contends that Karr's debts to Alexico are excepted from discharge by § 523(a)(6). It provides, "A discharge under section 727 . . . does not discharge an individual debtor from any debt — . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity." This Court has explained the requirements for an exception to discharge under § 523(a)(6) as follows:

> [W]ithout proof of both a willful act and malicious injury the objection to discharge under this subsection fails. The exception covers "only acts done with the actual intent to cause injury." In order to constitute a willful act, the debtor must intend to cause the consequences of his act or believe that the consequences are substantially certain to follow. The malicious element requires proof that "the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury." "[N]on-dischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." The exception generally applies to tort damages resulting from intentional torts, such as assault and battery or intentional infliction of emotional distress.[54]

The Trustee asserts he is entitled to summary judgment since Karr, knowing from

---

[54] *Guinn v. Anderson (In re Anderson)*, 403 B.R. 871, 881 (Bankr. D. Kan. 2009) (citations omitted).

31

the summer of 2007 forward that Alexico was having severe cash flow issues, continued to pay his personal expenses, including payments to family members, a vacation to Mexico, pool cleaning, and country club dues. These acts are alleged to have caused willful injury because Karr "believed they were substantially certain to cause injury to Alexico and . . . were malicious because they were substantially certain to cause injury to Alexico." Karr responds that the record does not support a finding that he acted with the specific intent to injure Alexico, and that when he realized Alexico was having cash flow issues, he reduced his salary, attempted to get a loan, located a buyer for Alexico, and attempted to sell the business. Karr states by affidavit that he did not intend to harm Alexico and points out that any harm to Alexico was against his self-interest since he was the sole shareholder of Alexico.

The Court finds that controversies concerning material facts preclude summary judgment on the claim of denial of discharge under § 523(a)(6). There is no controversy that Karr harmed Alexico and, when he became aware of Alexico's financial problems, did not cease his diversion of corporate assets. However, the uncontroverted facts are not sufficient for the Court to conclude that Karr acted willfully and maliciously, rather than simply out of self-interest with a false belief that the company could be salvaged.

**CONCLUSION.**

For the foregoing reasons, the Court grants the Trustee's motion for summary judgment as to his objection to discharge under § 727(a)(7), based on Debtor Karr's misconduct in connection with the related Alexico bankruptcy case, and § 727(a)(5),

based on Karr's failure to satisfactorily explain his loss of assets. The Court also grants the Trustee's motion for summary judgment as to his objection to discharge of Karr's debts to Alexico, under § 523(a)(4), for fraud or defalcation while acting in a fiduciary capacity. The Court denies the Trustee's motion for summary judgment as to his objection to discharge of Karr's debts to Alexico under § 523(a)(6), based on allegedly willful and malicious injury to the property of another.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058 and Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED.**

**# # #**

33